Next case on our docket is In Re the Marriage of Downs 09-401. Ms. Asher, you're up next. May it please the Court, Counsel. My name is Jenny Asher, and I represent the petitioner of Holland, Melissa Nichols. For ease, I'll refer to the parties as Melissa and Doug, but I need no disrespect. A review of this record demonstrates that the award of Diana and Daniel Downs' custody was based not on their best interest, but rather on Melissa's violation of a court order with respect to alcohol use. Everyone, the trial court, Melissa, Doug, agrees that Melissa was the primary character for these children up until the date of separation. The report of the GAO reveals that Diana was comfortable at her mother's house and could become comfortable at Dad's house. In his brief, Doug suggests that the most important period for scrutiny was the period between the date of filing in December of 07 until the time of trial in January of 09. This position, however, calls for the bulk of the children's lives in the period of normalcy to be disregarded. The record reflects the following. Diana was born on August 2, 2002. She was five years old at the time the parties separated. Daniel was born March 14, 2006. He was one when the parties filed for divorce. Everyone agrees the first five years of Diana's life, the first year of Daniel's life, Melissa was the primary caregiver. In fact, Doug states in his brief that he worked long hours and was self-employed as a farmer because he entrusted the care of these children to his wife. Doug then asserts that from December of 07 through January of 09, they both became daily caregivers for these children. That's not the case. In December of 07, when the parties filed for dissolution, a temporary order was entered awarding Doug two midweek visitations from 4 to 8 in one 24-hour period. No evidence in the record exists that this schedule was substantially deviated from. And although this might seem trite, I think it's important. Doug had these children for approximately 32 hours a week. And although the only expansion in visitation was he started picking up Diana from school, maybe expanding from 4 to 8, from 3 to 8, or 2.30 to 8, in one overnight weekend period. We're not talking about alternating weeks here or a typical 50-50 split where mom has the kids on Mondays and Tuesdays, dad's Wednesdays and Thursdays, and alternating a long weekend. Melissa cared for these children 12 out of 14 nights. She was the one that ensured Diana got to school each morning, that the children were fed, cleaned, and taken care of for the remainder of the week. During this time, Diana and Daniel also spent considerable time with their older siblings, Elena and Paulette. The record is absent of any finding of Doug's abilities or capabilities as a parent. It does reflect that he hired a nanny to do all the cooking, the laundry, and to do the household chores when he had the children in his care. Doug is self-employed as a farmer and owns a trucking business. He provided for his family during the course of the marriage and worked long hours. The court accepted his assertion that he would continue to make these professional concessions. Doug's testimony was that he would continue to have the nanny and that he would continue to use the services of a daycare provider. A daycare provider who was chosen by my client because it was Melissa who dealt with the children's medical needs, Diana's educational needs, and daycare needs for Daniel. Illinois law is clear that an important consideration in the custody determination is what parent provided primary care to the children. The record clearly reflects that Mrs. Melissa and her two older daughters, Elena and Paulette, provided the care, by everyone's account, up until December of 07, and at least, by Doug's account, half of the care from December 07 through January of 09, but a careful review shows 12 out of 14 nights through the period of separation. Melissa's employed as a school teacher. She has normal work hours. She has the ability to raise children. She has the ability to provide a consistent environment, and she doesn't work during the summers. Another area of law that we find pretty consistently in Illinois is the court's desire to keep siblings together, and this has been extended to half-siblings, and the rationale behind it is a good one. The children's parents will no longer be together once divorce is filed. However, the semblance of the family, Diana and Daniel knew Elena and Paulette 12 out of 14 nights during separation, and they were there constantly throughout the course of the marriage. Was there a GAL appointment for the children? There was a GAL appointment. For both children, just one person, I guess? Yes, it was one person for both children. Did he or she make a report to the court as far as custody is concerned? He did make a report, and I did not try it at the trial level. The record shows that he acted more like a child's representative, asked questions throughout the course of the trial. There was a report submitted. Is that part of the record? It was not part of the record. His findings were contained in the record, but the actual report was not contained in the record. Would you like to know his findings? No, go ahead. I'd like to know, did he make a recommendation? He did not make a recommendation with respect to custody either way. What he did find was that Diana, he essentially said that Daniel was too young. He couldn't make any recommendations with respect to Daniel. But Diana was comfortable in her mother's home and could become comfortable in her dad's home. And he recommended more stability. He recommended that the periods of time for the non-custodial parent be more traditional in nature and not two nights a week and one night every weekend. That was his recommendation. And the parties followed in the marriage and throughout the separation. These siblings were close. What the trial court noted was that there was a special bond between Elena, Paulette, Diana, and Daniel. They acted as a family unit throughout the marriage and after separation. Melissa and all four children left the marital residence in February of 2008 and continued to act as a family unit until January of 2009. The trial court made a decision speculating what would be in Diana and Daniel's best interest. There was no other way around it. Melissa had to take care of the children up until that time. The trial court stated, I have a mother who was a primary caregiver and a father who stepped up and became more involved. And then the trial court stated, and then I have this alcohol issue. The court went on to express doubts about Melissa's credibility and stated that her lack of credibility could lead to her lack of enforcing a positive relationship between Doug and the children. My client testified that she believed that Doug should have more traditional relationship with these children. She wasn't trying to cut Doug out of their life. There was some testimony back and forth. Did the children call when in her care? Did Doug have the children call her when they were in his care? A separation is not an easy period. There was testimony with respect to that. But my client testified that he should have midweek overnight visitation and alternating weekends. She wasn't trying to cut Doug out of their lives. There's nothing in the record that reflects that she was trying to hinder that relationship. And what does the record really show with respect to alcohol? This isn't a woman who has a drinking problem. She's never been diagnosed with a chemical dependency. She's 41 years old, never been arrested, ticketed, pulled over, anything with respect to alcohol. She's never been marked hardy at work. The children have never been marked hardy at work. She started, Doug is a strict Baptist and doesn't believe in consumption of alcohol. And there was some concerns he raised with respect to her consuming a few glasses of wine about the time her mother died. It was not an easy time for her. She agreed, she voluntarily entered into this prohibition of alcohol. Should she have done that? Probably not. And should she have violated a court order with respect to alcohol? Absolutely not. I'm not standing here condoning that at all. But she should be punished for violating that court order. She should be thrown in jail for a weekend, made to do community service. These children shouldn't be punished. 602B is clear that the parent's conduct that affects the relationship with the child is the only conduct that can be considered in a custody determination. The record does not contain any facts that suggest that these children were ever endangered by my client's alcohol use. Are there other factors that the trial judge articulated like the new boyfriend and moving out of the community where the children were and that the father was going to be in the home? Are those factors that are not relevant? Those are factors that are relevant, obviously. So the court's aware. Their two homes at the time of trial were approximately three to four miles apart. And although we are talking about a new school district, my client made the conscious decision she wasn't moving the children in the middle of the school year. And we're talking about a second grader. And I understand the importance of having a consistency. But this little girl went from her older sister helping with her in the morning after my client left for work to go to teach in Pena. Her sisters helped take care of her, got her to school. They were there for her after school. In January, that all changed. Talk about not being stable anymore. Yes, she's in the same school. She doesn't have the same care providers before school. She doesn't have the same care providers after school or in the evenings. So that is a factor, but I think that the court abused its discretion in the way it assigned to that factor. Who would have been living at the mother's home if she had received custody? If she had received custody at the time of trial? At the time the order was entered, what was anticipated from the testimony? Was the boyfriend living with her at the time? He was not living with her at the time. Was that anticipated? It was a possibility, but the record does not reflect. And, again, I didn't try the case. The record doesn't reflect the intentions, but it does not reflect that there was any definite plans at all with respect. He was an integral part of their lives, but no. Did he also have children that he had custody of? He does also have children. How many? Is it in the record? It is not in the record. Okay. It is not in the record. Okay. I'm sorry. The trial court stated a whole bunch of stuff shows bad judgment and potentially could harm these children. And the trial court stated, if these are true, I'm not going to wait for mom to be driving and to get a DUI with the kids in the car. That's not the proper analysis for a trial court to make when looking at a custody award. This mother was a stable mom who was a primary caregiver for these two young children throughout the course of their entire life, to the time of separation and to the time of trial. At the time of trial, these children went from spending 12 out of 14 nights with their mother to spending three out of 14 nights with their mom. Now, that was expanded after the motion to reconsider. But these children still go from Thursday of the off week to Friday of the next week, six consecutive days where they do not see their mom. How many days out of 14 are the children with their mother now? They have both Thursday overnights and alternating weekends, Thursday through Monday. So six out of 14. Six out of 14. Okay. You look at time that the mother had with these children, but you also look at the other aspect of custody, which is not just physical custody but legal custody. Again, the record's clear. My client was the one making the decisions with respect to their school, with respect to their daycare provider, with respect to medical decisions. She went from playing an everyday, daily role in these decisions, having no say whatsoever. No say whatsoever. And also getting back to the concept of stability. They left the marital residence in February of 08. Trial wasn't until January of 09. At the time the GAL made his recommendation or his opinion that the children were adjusted and were stable at Melissa's house, nearly a year had gone by. So this isn't a case where the kids were going to have to leave the marital residence upon a decision of custody. They had been gone since February of 08. The trial court failed to give adequate consideration to the factors weighing in Melissa's favor. The court relied too much on the alcohol evidence that Dove spent $12,000, essentially on spies, to follow my client nearly daily for nine straight months. And what did that $12,000 find? It found that Melissa purchased alcohol on three occasions, never found her consuming alcohol in the presence of children, consuming alcohol on two occasions, never more than two drinks. The record is absent of any findings where alcohol impeded her ability to be the primary caregiver for these children. She was always the parent attending to the children's day-to-day needs, not Dove. I thought the trial court articulated numerous incidents where he relied on testimony from the father about the detriment to the children. The only – the father testified that on two occasions – and let me just back up a little bit so you can set the stage. When the parties initially separated, my client had exclusive possession of the marital residence, but Dove had some access to the residence with respect to operating his business. And he testified that on two, maybe three occasions, he came in and smelled alcohol on Melissa. That was in the early part of the separation, and that was during a period where he could have had Melissa, because of the February 08 order prohibiting alcohol, he could have had her submit to a breathalyzer test. Never did. He still gave her the children. He never withheld the children because of his fear of alcohol. So that's the limited testimony that the court relied on, along with the Super Bowl incident, where my client called Dove and said, I'm driving – or the older daughter, Elena, was driving, said, we're driving home from a Super Bowl party. Dove's testimony was she sounded intoxicated, but she's the one who called Dove. Thank you. Thank you. Ms. Harlow, is that correct? Yes, Your Honor. Your Honors, my name is Amanda A. Harlow. I am from the DPAC Law Office, and I represent Dove Downs. And similar to Ms. Asher, for the ease of the court, I will refer to them as Melissa and Dove without any disrespect as well. The trial court made a determination that Melissa was not a credible witness. There are certain facts that it relied on, and those facts, for example, that the two children of the parties had a good relationship with the two older children. Things of that nature. The court determined that was credible. We – Dove didn't disagree with those things. In most situations, you will find that children have a good relationship with one another. But this trial court found that Melissa had violated not one court order, but several different court orders. Now, counsel would like you to believe that the alcohol was this huge thing that we put on at trial level. It is significant in the fact that she had a specific court order that she agreed to not to consume. The important aspect is that if she is unwilling to follow not one, not two, not three court orders, how is she going to be willing to facilitate a relationship between the children and their father? The capabilities of each parent don't always necessarily have to be specifically spelled out for the trial court. Most of the time, what we see is the bashing side. In this instance, we didn't see anything that came across to the trial court that meant that Dove had any problems raising these children or doing it himself. He had a team effort. He hired a nanny. He agreed with that. After ten months of the initial divorce proceeding, he realized at that point it was important for him, for his four hours every Tuesday and Thursday and his overnights on Saturdays and Sundays, that the most important thing was his children and the time he spent with that and maximizing their educational needs and their learning capabilities. That was his testimony. He gave up part of his professional concessions where I hired another employee to be out in the park. I'm working from home more in the office doing these things so that I can spend more time with my children. We're divorced or we're going to be divorced. In most situations, in most cases that you may have seen and that we've seen at the trial level, there's always one parent that is primary throughout the marriage. A lot of the times, throughout the dependency of the divorce proceedings, there's only one parent still that's the primary.  At the time the divorce proceedings began, my client decided I have to make these concessions for my children. Nothing is going to be normal. There is no sense of normalcy in a divorce proceeding, nor is there one afterwards. The best thing that he could have done is exactly what he testified he did. I gave up some because my children deserve it. The trial court found that there were three of the 602 factors out of the nine that were relevant to this case. It isn't a tallying situation where you have Melissa gets two factors and Doug gets one factor, so that's two to one. That's how we rate it. That isn't how the trial court did it. Her testimony, her credibility was very low. He assigned very little weight to those two out of the three factors. It was obvious from the transcript that the biggest factor that the court relied heavily on and gave great weight to was the willingness to facilitate a relationship between the children and the parents. And when you violated, as Melissa did, violated several court orders, time after time after time, it does not appear to the court that she is going to be willing to facilitate that relationship. Now, not every divorce case is going to go smoothly. Not every order is going to be followed perfectly to the T and dotting all the I's. But there has to be some point where major flaws, major violations of the court's order that directly concern the welfare and safety of the children. So that's it. Did the parties ever try to explore a joint parenting agreement in this case? The parties did attend mediation, and they attempted to, but no, they did not. I don't believe that joint parenting would be my client didn't believe and testified that he did not believe joint parenting would work. And that's in the record? Why he believed that it wouldn't work? Well, he testified the number of times, well, the problems that arose between the parties at transfer of the children. He also testified that he just couldn't talk to Melissa. That part is in the record, the phone calls. She would never answer any of the phone calls that he would call her with regards to. There are several situations, issues between the parents, and under joint parenting or under joint custody, it says that they have to have an ability to cooperate. And when that happens, when we see that, it's directly affecting the children. Here we have two people who start out trying by meeting and exchanging the kids at a local gas station in Edinburgh. And somehow or another, things develop over time that they go to the Christian County Sheriff's Office parking lot to exchange the children. And then there's an occurrence where they have to go now inside to exchange the children for visitation exchanges that should last two minutes or so. My client didn't feel comfortable allowing any different type of exchange to occur, given the degree of tension between the parties based upon the divorce. One of the things that I believe to be important is the fact that the children went from being with mother and father each day, and then the divorce happens, or the divorce proceeding begins. And it appears to be okay that one parent, at some point, only from going to seeing the children every day to seeing their kids one day per week and every other weekend, when in fact, in this situation, what occurred is that Doug was seeing his children every other day. And of course, it's not overnight, but we know that they sleep. But he was picking up one child from school, assisting with educational needs, going through her homework, helping her with homework, signing her agenda, and that was introduced into evidence that on every other day, on those Tuesdays and Thursdays that my client had his children, he was the parent that was signing. It isn't one of those things that can be characterized. He just sat down and did nothing. He stood up. He started taking care of his kids, because he knew that nothing was going to stay the same. The 602 factors, the other instance, or the other factor that was important was the children's adjustment to their home, school, and community. The marital residence was located outside of Edinburgh, Illinois. It's a farm, approximately. I think the testimony was like a mile or two out into the country. At that time of trial, Melissa had moved into Tampa, Edinburgh. So we have now taken the kids from the marital home, the only home that they know, and put them into a new home, although the parties remained close in distance to one another. What did come out at trial was that Melissa had intended to move to Taylorville. She had already purchased a new home inside the city limits of Taylorville, Illinois. It would require the children being removed from the Edinburgh School District to the Taylorville School District, and she did intend, and it was her testimony that her boyfriend was going to move in with them and then his kids as well. That was in the testimony. This institutes a whole new sphere for Diana, and then we're not only changing the makeup of the one family, but we're increasing it to include a whole lot more. Not necessarily a bad thing, but with these younger children, moving them from what they know to a completely new town, a completely new community, a completely new family. It's my opinion that the trial court saw that that was something that was detrimental to the kids when they could remain in the home of their father, remain in the same community, remain in the same school district, and visit their mother on a regular basis, a longer basis than in every other day and one overnight per weekend or one night per week and every other weekend, but a consistently longer amount of time. Melissa does have significant visitation time, 6 out of 14, almost half of the time. In the summers, she has 2 weeks, 2 non-consecutive 2-week periods, so out of almost 8 to 10 weeks in the summer, she has 4 of those weeks of pure time for her uninterrupted. It is significant, and I believe that it is important that the children remain having a close relationship with the person that was their primary caretaker. But the primary caretaker can't rule the day. There's more to the evaluation than just being the primary caretaker. We see it oftentimes that the mothers are the primary caretaker, but the problem is that this case, dad stepped up and said, I'm going to stop doing so much. I'm going to hire somebody else to do what I was doing before so I can do this with my children too. The whole role of this family changed when the divorce proceedings began. Did he do that after the temporary custody agreement? Because there was an agreement about temporary custody going to mother. Did he make that change then, or when did he make that change? I believe his testimony would have been he made that change after. I'm not exactly sure. After the temporary custody agreement. The temporary custody agreement was in February. My client's a farmer and he does trucking, so that would have been his downtime according to his testimony. It was December and January he would have been down. So it wasn't a promise that he was going to do it. He actually did it. He actually did it, and that was his testimony. The hiring of babysitters and nannies to do things, in this situation Melissa relies on the two older children to be her team. It's a team effort. And to kind of hit on Doug saying you hired a nanny, you hired a babysitter, you did this. Well, he has an ability to have a team effort as well. The better part for Melissa is that it's right there in her home. In fact, the trial court saw that, that it was probably likely that those kids were spending more time with the siblings than they were with mom. The siblings were taking Diana to school. The siblings were picking up Diana after school and watching her until her mother was able to get home. And she does have a normal workday schedule, kind of a Monday through Friday, get out at 3 o'clock. But the flexibility of each parent in this situation, Doug's schedule allowed more of that to be able to stay home with Daniel more through the day because he was younger. And that is what he ended up doing because he was able to hire someone. He was able to be home with the children throughout the day if they weren't in school. If they were sick from school, he had that ability to take care of those things. Did the trial judge consider joint custody at all? No. I think that's clear from the record that he did not believe that these parties were able to get along on any level. And that remains our position as well, that at this time it's just not, it hasn't worked. Up to the date of trial and the date of the motion to reconsider, well, up to the date of trial, it hadn't worked in the ability to cooperate. Your client wasn't pushing for joint custody or was he? Initially, that was the discussion, was pushing for joint custody. Initially... He argued for joint custody? Correct. Well, we argued for sole custody at the trial level, at the actual trial, the two and a half days. In the very beginning, we were fighting for joint custody. We didn't know at that time, January, February, March, the level of, or the number of violations of the court's order that Melissa was doing. And that's part of, and the amount of alcohol she was drinking. The incidences of her, of my finding Melissa face down, I believe those words were passed out, reeking or smelling of alcohol. Those warnings were in January of 2008 was his testimony. And then the Super Bowl would have been February of 2008 as well. At that point, he had recognized that there was consistent alcohol use. When was the temporary custody order? I believe that was in February of 2008. So that was subsequent to him learning about these other things, that he agreed to let her have temporary custody. It could have been subsequent to. If he was so concerned about it, why would he agree to let her have temporary custody? If this is the basis for him and the court for switching custody. He didn't realize, I don't think at the time, the amount of alcohol that it was actually impacting on her. Go ahead. I don't believe that there was an impact at that point in time that was recognizable. Thank you. Any rebuttal panel? First I want to apologize. She has five out of 14 nights with the children under the current schedule. My nerves got the better of my counting skills, so it's five out of 14. I think it's important for the court to recognize Doug's position. I should be awarded custody because I stepped up to the plate. I'm not saying that he doesn't deserve a pat on the back, but any time a family is going through divorce, the parents' rules are going to have to change. Everything in the record reflects, if Doug was going to spend any time with these children, his workout habits and his hours were going to have to change because Melissa did everything up until the time of separation. So to suggest that he should somehow get custody because he stepped up to the plate I think is a stretch. And then we look at Melissa's credibility. Her credibility leads the court to believe that she's not going to foster a relationship. Her violation of these court orders had nothing to do with her ability to foster a relationship between Doug and the children. The record does show, though, in fostering a relationship, he had spies following her and the kids around every single day. One wonders, is that supporting a healthy relationship between Melissa and her children? The record is absent of any facts showing that she did not support a relationship with these children. What about the phone call issue while she was in Alabama? Outside of the telephone call in Alabama. And again, had I tried this case, would I have tried it differently? Yes, I would have. And I apologize, I had to double-check. I believe that was disputed by Melissa. I'm sure it was, but there was testimony to support it. There was testimony to that. There was also testimony that the record shows that she had to file a petition to even leave to go to Alabama. Doug wouldn't agree to it. So it went both ways. This was an instance where Mr. Downs wanted to still be married to Melissa and that wasn't going to happen. Do you also agree that joint custody was not appropriate in this case? My brief argues joint custody. I argue it for this reason. I understand that at first blush it could be a stretch, that the parties are exchanging the children at the sheriff's office. They don't get along. However, if you look at the core, what is joint legal custody? Decisions making with respect to school, doctors, religion, and I always think of extracurricular because I think that's what impacts people's daily lives the most. Who's going to decide if this little girl gets to do dance, if the little boy does swimming lessons? Before it was Melissa. Now she has no say in that. So do I think it's important for these parties to work together in making these decisions for these kids? I do. And there's an interesting case that discussed, it awarded joint custody sui sponte, saying although the parties didn't get along, what they mostly didn't get along with regard to was visitation exchanges. And the court took care of that problem by saying, okay, here's where the visitation exchanges are going to happen. Did the trial court consider joint custody? Here's what the trial court said. It says there's absolutely no evidence that they can communicate and cooperate on any issues, let alone the kids. And it rejected joint custody. That's right. That's the trial court in this case did find that, yes. But again, my client's position is she is willing to work with her children's father with respect to legal decision making for her children. Our argument is that the records don't support a board of custody to Doug. But at the very least, she should be able to have a say in what is happening with her children. She's decided everything for the first five years, for the first year of Daniel's life. Although they don't get along, I think a true careful review of the records reveal that there's no dispute over the major issues concerning these children. And currently, the party's like ten miles apart. So if we talk about switching a six-year-old from Enver to Taylorville, she moved five to six miles. She's ten miles from her father's residence when she's at her mom's residence. We're not talking about switching of communities here. And again, we're talking about a first grader, a second grader, not a child who is heavily involved in sports, is going to have to switch a sports team, is in the middle of a school year. Very young children at issue in this case. Melissa? Thank you. Thank you, ladies. For your argument, we'll take the matter under advisement. Get back with you. I notice this is a 306 expedited appeal.